UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>BRAD HARE and<br>MAMMOTH WEST CORPORATION,<br><br>Defendants. | Civil No.   24-12134<br><br><br>Complaint<br><br>Jury Demand |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "SEC" or "Commission") for its

Complaint against Defendants Brad Hare ("Hare") and Mammoth West Corporation d/b/a

Mammoth Corporation ("Mammoth") (collectively "Defendants") alleges as follows:

## SUMMARY

1.      From at least April 2018 through early 2024 (the "Relevant Time Period"), Brad

Hare and his wholly controlled business entity, Mammoth West Corporation, bought and sold

billions of shares of newly issued shares of microcap securities, otherwise known as penny

stocks, and generated millions of dollars from those sales.  In doing so, the Defendants failed to

comply with the SEC's mandatory dealer registration requirements under the federal securities

laws.  Mammoth as part of a regular business and through Hare – its controlling principal –

engaged in the buying and selling of securities for Mammoth's own account.

2.      Mammoth's business model, as designed by Hare, included repeatedly purchasing

convertible notes, a type of security, from penny stock issuers and penny stock debtholders,

converting the notes into stock at a large discount from the prevailing market price, and selling the newly issued shares into the public markets for a substantial profit. Specifically, Mammoth acquired approximately 47 convertible notes during the relevant period and converted notes involving approximately 19 different companies issuing stock.

3.    Mammoth, through Hare, gained over $2.5 million dollars in net profits from selling the shares, which consisted of the difference between the costs of acquiring the convertible debt securities and the trading proceeds obtained from converting the debt into shares and then selling the shares into the market. Defendants' illegal activities, which generated significant profits for themselves, diluted the value of shares held by other shareholders.

4.    By engaging in a regular business model of buying convertible notes and selling the resulting newly issued shares of microcap stock into the public market, the Defendants operated as unregistered securities dealers.

5.    By failing to comply with the dealer registration requirements of the federal securities laws, Mammoth and Hare avoided the regulatory obligations that govern dealer conduct in the marketplace, including submitting to regulatory inspections and oversight, following financial responsibility rules governing brokers and dealers, and maintaining books and records in accordance with applicable regulatory requirements.

6.    By virtue of the conduct alleged in this Complaint, Mammoth and Hare have violated Section 15(a)(1) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78o(a)(1)].

7.    Unless Mammoth and Hare are restrained and enjoined, they will continue to engage in the acts, practices, transactions, and courses of business set forth in this Complaint, or in acts, practices, transactions, and courses of business of similar type and object.

8.      The SEC brings this action seeking injunctive relief, disgorgement with prejudgment interest, civil penalties, and other appropriate and necessary equitable relief, including penny stock bars and an order that Mammoth surrender for cancellation any shares or conversion rights obtained through its convertible notes business which are still held by Mammoth.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

10.      Hare, during the Relevant Time Period, resided in the Northern District of Illinois. Mammoth's principal place of business is within this district. And certain of the acts, practices, and course of business constituting violations of the federal securities laws alleged herein occurred in this district. Venue therefore is proper in this district pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa].

## DEFENDANTS

11.      **Mammoth**, doing business as Mammoth Corporation, is a Wyoming corporation created in 2001, with its principal place of business in Lake Zurich, Illinois, in this district. Hare founded Mammoth and is its sole officer and beneficial owner. During the Relevant Period, Mammoth was engaged in the convertible notes business. Mammoth had approximately three other employees working on its behalf during the Relevant Period. Mammoth has never been registered with the Commission in any capacity.

12.      **Hare**, age 55, resides in Johnsburg, Illinois. He is the sole officer and beneficial owner of Mammoth and exercises ultimate decision-making authority over its business. Hare received salary from Mammoth. During the relevant period, Hare was not registered with the

Commission in any capacity, including as a broker-dealer, nor associated with any registered entity. Hare was associated with broker-dealers as a registered representative from 1988–1996 and 2015–2017.

## FACTUAL ALLEGATIONS

13.     Hare has owned, controlled, and funded Mammoth since its inception, including during the Relevant Time Period. In addition, Hare made all investment and trading decisions on behalf of Mammoth, including for all transactions described below.

**A.     Defendants Bought Convertible Notes from Penny Stock Issuers, Converted Them to Newly Issued Shares of Stock, and Sold Large Volumes of Shares in the Market as Part of their Regular Business**

14.     During the Relevant Time Period, Hare operated Mammoth, a business in Lake Zurich, Illinois, through which Mammoth regularly purchased convertible notes from penny stock issuers and penny stock debtholders in need of cash.

15.     After holding the notes for approximately six to twelve months or acquiring existing notes that had already been held, Hare converted Mammoth's notes into newly issued shares of stock at a deeply discounted price negotiated in advance of purchase and sold that stock into the market at a profit.

16.     Mammoth, through Hare, frequently engaged in convertible note transactions as part of its regular business.

17.     Mammoth was a well-known debtholder and lender to penny stock issuers, and Mammoth and Hare held themselves out to the public as being willing to buy convertible notes as part of Mammoth's regular business operations. The Defendants generated business through industry referrals, advertising on a website, and soliciting business through Hare's database of business contacts that he had developed over many years.

18.     Hare personally negotiated the terms of the convertible notes that Mammoth purchased directly from penny stock issuers.  As a result of Hare's negotiations, Mammoth generally received very favorable terms.  On behalf of Mammoth, Hare signed the securities purchase agreements by which Mammoth acquired the convertible notes.

19.     The terms negotiated by Hare typically included: (a) a nine-month to two-year maturity date; (b) principal amounts between $6,000 and $2,200,000; (c) interest rates around 18% in the event of default; and (d) steep prepayment penalties.

20.     The convertible notes acquired by Mammoth, through Hare, also included a term allowing the conversion of debt into shares at a significant discount to the prevailing market price, which was central to the success of the business plan.

21.     The term typically allowed Mammoth, in its sole discretion, to convert the debt into the issuer's common stock at a market-adjustable price of 40% to 50% of the lowest trading price of the stock in the 10 to 90 days preceding each conversion.  This term, which gave Mammoth a spread or markup on the stock that it sold, is a common attribute of a securities dealer.

22.     Mammoth, through Hare, also typically negotiated an "original issue discount" when it purchased a note.  This discount entitled Mammoth to acquire a note for a price less than the face value of the note but to convert the note to stock based on the face value of the note.  The amount of the original issue discount varied but was typically 5% to 10% of the total note amount.

**B.     Defendants' Activities as Unregistered Dealers Yielded Significant Profits**

23.     The newly issued stock that Mammoth received through the conversion process was restricted.  SEC Rule 144 enables non-affiliates to acquire restricted stock directly from the

issuer in a private transaction and to resell it into the market after observing a holding period, among other requirements. [*See* 17 C.F.R. § 210.144]. Mammoth often began the conversion process soon after the Rule 144 holding period for the notes expired, or, in the event that Mammoth had purchased a note for which the holding period had already expired, soon after acquisition of the note. Hare submitted the conversion notices to the issuers himself or through employees of Mammoth who acted at Hare's direction.

24.     Mammoth generally converted the notes in several increments because the notes' terms typically restricted Mammoth from owning more than 4.9% or 9.9% of an issuer's outstanding shares.

25.     Mammoth, through Hare, obtained billions of shares of stock directly from issuers through repeated note conversions and not from purchases in the secondary market. These shares were newly issued, and the sales of the shares into the market significantly increased both the amount of shares in the hands of the public and the issuers' outstanding unrestricted share totals. Selling large quantities of newly issued shares into the market is a common attribute of a securities dealer.

26.     Hare personally, or through Mammoth employees acting at his direction, arranged for the converted stock to be transferred electronically to Mammoth's brokerage accounts. As part of this process, Hare obtained attorney opinion letters to assure Mammoth's brokerage firms that the converted stock was no longer restricted and could be resold to the public.

27.     Once the shares were deposited into Mammoth's brokerage accounts, Mammoth, through Hare, typically began selling the shares as rapidly as the market would bear without depressing the issuer's stock price, usually within a few days or weeks of conversion. Hare did so to lock in Mammoth's profits.

28.     Between April 1, 2018 and January 2024, Mammoth, through Hare, submitted nearly 100 conversion notices and sold over 11 billion newly issued shares of common stock into the public markets.

29.     Mammoth's profits from the sale of newly issued shares are attributable primarily to the discount Mammoth received on the converted stock, rather than from any appreciation in the share price.

30.     Mammoth, through Hare, often reaped significant profits on its convertible note transactions within a short period of time.  For example, on January 18, 2019, Mammoth, through Hare, purchased a convertible promissory note for $150,000 from a debtholder of penny stock Issuer 1.  The promissory note had a face value principal amount of $157,062.

31.     Pursuant to the transaction, Mammoth, through Hare (i) entered into an agreement with Issuer 1 to restate the convertible promissory note in Mammoth's name; and (ii) obtained an attorney opinion letter opining that the Rule 144 period had expired, and that Mammoth could begin converting the note into shares immediately.

32.     On or about January 22, 2019, February 1, 2019, February 11, 2019, and March 1, 2019, Mammoth, through Hare, submitted conversion notices to its broker-dealer and Issuer 1's transfer agent to effectuate the conversion of the note into over 1.4 billion shares of Issuer 1.

33.     The shares were obtained at a significant discount because the terms of the note entitled Mammoth to obtain shares at 50% of the lowest trading price of Issuer 1's shares over the preceding year.  After the shares were acquired and deposited, Mammoth sold them almost immediately.  Between January 30, 2019, and March 13, 2019, Mammoth, through Hare, sold 1.4 billion shares of Issuer 1, reaping trading proceeds of over $336,000.

34.    Defendants' convertible notes business was lucrative.  Specifically, Mammoth generated over $2.5 million dollars in net trading profits from the post-conversion sale of the newly issued shares, and Mammoth transferred hundreds of thousands of dollars in salary to Hare as the sole officer and beneficial owner of the company.

**C.    Defendants Bought and Sold Penny Stocks**

35.    Virtually all of the stock Defendants bought and sold were penny stocks that did not meet any of the exceptions from the definition of a "penny stock," as defined by Exchange Act 3(a)(51) and Exchange Act Rule 3a51-1. [15 U.S.C. Section 78c(a)(51); 17 C.F.R. Section 240.3a51-1].

36.    Defendants therefore participated in the offering of penny stock to investors by acting as securities dealers engaged in the buying and selling of penny stocks.

**D.    Defendants Violated the Federal Securities Laws by Acting as Unregistered Dealers**

37.    Any person engaged in the business of buying and selling securities for such person's account (through a broker or otherwise) as part of a regular business must register with the Securities and Exchange Commission.  During the Relevant Time Period, Mammoth, through Hare, was engaged in the business of buying and selling securities for its own account and was not registered with the SEC.

38.    Defendants used means or instrumentalities of interstate commerce to buy and sell securities as part of their regular business.  For example, Defendants placed trades on national securities exchanges through a broker and communicated with the borrower companies and brokers using national telephone and other electronic communications networks.

39.    During the Relevant Time Period, neither Mammoth nor its founder Hare was registered with the SEC as a dealer.

40.     During the Relevant Period, Hare was not associated with a dealer registered with the SEC.

41.     A broker-dealer who seeks to register with the Commission must file an application on a form called Form BD.  To register as a dealer, the applicant must meet the statutory requirements to engage in a business that involves high professional standards.

42.     Registration with the Commission requires the dealer to provide important information about its business, including but not limited to the names of the direct and indirect owners and executive officers of the business, certain arrangements with other persons or entities, the identities of those who control the business, the states in which the dealer does business, past criminal or regulatory actions against the dealer or any affiliated person that controls the business, and financial information, including bankruptcy history.

43.     Registration also requires the dealer to join a self-regulatory organization, or a national security exchange, which assists the Commission in regulating the activities of registered dealers.  Finally, registered dealers are subject to inspection by Commission staff and the Financial Industry Regulatory Authority ("FINRA") to monitor compliance with the securities laws.

**THIS ACTION IS TIMELY FILED**

44.     Defendants agreed to toll any statute of limitations applicable to the claims alleged herein during the period from April 1, 2023, to the present.

## CLAIM FOR RELIEF

### Violations of Section 15(a)(1) of the Exchange Act [15 U.S.C. §78o(a)]
### (Against All Defendants)

45.     The SEC re-alleges and incorporates by reference the allegations set forth in

paragraphs 1 through 44 above.

46.     By engaging in the conduct described above, Defendants made use of the mails or

other means or instrumentalities of interstate commerce to effect transactions in, to induce, and

to attempt to induce, the purchase and sale of, securities as part of a regular business while not

registered with the Commission as broker-dealers, and while Defendants were not associated

with an entity registered with the Commission as a broker-dealer.

47.     By reason of the conduct described above, Defendants violated, and unless

enjoined will likely again violate, Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

48.     A violation of Section 15(a)(1) does not require proof of scienter.

## RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court:

A.     Enter a permanent injunction restraining each of the Defendants, their officers,

agents, servants, employees, attorneys and those persons in active concert or participation with

Defendants who receive actual notice of the Order, by personal service or otherwise, and each of

them from, directly or indirectly, engaging in the transactions, acts, practices, or courses of

business described above, or in conduct of similar purport and object, in violation of Section

15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

B.     Order Defendants to disgorge ill-gotten gains and/or unjust enrichment received

directly or indirectly, with pre-judgment interest thereon, as a result of the violations alleged

10

herein, pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)].

C.      Impose appropriate civil penalties upon Defendants pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

D.      Issue an Order restraining and enjoining Defendants from participating in the offering of any penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock, under Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)].

E.      Order Mammoth to surrender for cancellation its remaining stock, unexercised warrants, and conversion rights obtained in connection with Mammoth's convertible notes business that are still held by Mammoth.

F.      Retain jurisdiction over this action in accordance with the principles of equity and the Federal Rules of Civil Procedure to implement and carry out the terms of all orders and decrees that may be entered.

G.      Grant such orders for further relief as the Court deems just and proper.

## JURY DEMAND

The Commission hereby demands a trial by jury,

DATED:   November 25, 2024

Respectfully submitted,

By: /s/ James M. Carlson
James M. Carlson (IL Bar No. 6269506)
P. Davis Oliver (DC Bar No 490620)

SECURITIES AND EXCHANGE COMMISSION
100 F Street, NE
Washington, D.C. 20549
Tel: (202) 766-0263

11

Email: Carlsonja@SEC.gov
Oliverp@SEC.gov

*Attorneys for Plaintiff*